**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ELIYAHU MIRLIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| | ) 3:19-cv-700 (CSH) |
| v. | ) |
| | ) |
| EDGEWOOD ELM HOUSING, INC., | ) |
| F.O.H., INC.,  EDGEWOOD VILLAGE, | ) |
| INC.,  EDGEWOOD CORNERS, INC., | ) **JULY 30, 2020** |
| and YEDIDEI HAGAN, INC., | ) |
| | ) |
| Defendants. | ) |

<u>**RULING ON DEFENDANTS' MOTION TO DISMISS COMPLAINT [Doc. 18]**</u>

**Haight, Senior District Judge:**

Plaintiff brings this diversity action to require the five corporate Defendants to pay an unsatisfied judgment Plaintiff obtained in this Court against a nonparty individual and a nonparty corporation following a jury trial before Judge Shea.

Defendants move [Doc. 18] to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted.  Plaintiff opposes that motion.  The Court has considered the able briefs and oral arguments of counsel.  This Ruling decides Defendants' motion.

I

Plaintiff Eliyahu Mirlis, currently a citizen of New Jersey, was from the Fall of 2001 to the Spring of 2005 a boarding student at the Yeshiva of New Haven, Inc. ("the Yeshiva"), a religious

1

school in New Haven.  At this time, Mirlis was between fourteen and seventeen years of age.  The dean and president of the board of directors of the Yeshiva was a rabbi named Daniel Greer.

In 2016, Mirlis filed an action in this Court which alleged that while he was a boarding student at the Yeshiva, Daniel Greer had repeatedly sexually abused, exploited and assaulted him. I will refer to that litigation as "the Underlying Action."  The Underlying Action was tried before Judge Shea and a jury.  The jury found in favor of Mirlis and against Greer and the Yeshiva.  On June 6, 2017, Judge Shea entered judgment  against Greer and the Yeshiva for compensatory and punitive damages, in the total amount of $21,749,041.10.  Greer and the Yeshiva appealed.   The Second Circuit affirmed Mirlis's judgment in the Underlying Action against Greer and the Yeshiva. *See Mirlis v. Greer*, 952 F.3d 36 (2d Cir. 2020).  The judgment has not been satisfied.

Plaintiff Mirlis commenced this action in an effort to enforce his judgment against Greer and the Yeshiva.  The Defendants are five Connecticut corporations.  Plaintiff is a citizen of New Jersey. His complaint invokes the Court's diversity jurisdiction.  Plaintiff's theory is that these corporations should be required to pay the judgment Plaintiff obtained against Greer and the Yeshiva in the Underlying Action.

Plaintiff filed his complaint against the five Defendant corporations on May 8, 2019.  The corporations moved to dismiss the complaint on August 5, 2019.  At those times, the appeal of Greer and the Yeshiva from the judgment in the Underlying Action was pending.  This Court held consideration of Defendants' motion to dismiss the captioned action in abeyance until the Second Circuit decided the appeal from the judgment in the Underlying Action, since if that appeal was allowed and the Underlying Action judgment vacated, Plaintiff's present action to require these Defendants to pay the judgment would be mooted.

2

The Second Circuit filed its opinion affirming the judgment in the Underlying Action on March 3, 2020. This Court thereupon restored Defendants' motion to dismiss Plaintiff's Complaint to the calendar, heard oral argument, and now decides the motion.

II

Plaintiff Mirlis's present Complaint undertakes to plead viable claims that the five corporate Defendants are liable to pay the judgment Mirlis obtained against Greer and the Yeshiva in the Underlying Action.

The Defendants are Edgewood Elm Housing, Inc.; F.O.H., Inc.; Edgewood Village, Inc.; Edgewood Corners, Inc.; and Yedidei Hagan, Inc. ("YH"). Each is alleged to be a non-stock corporation, incorporated under Connecticut law with a principal place of business in New Haven, Connecticut. Doc. 1 ("Complaint"), ¶¶ 9-13.

As for F.O.H., Inc., Edgewood Village, and Edgewood Corners, it is alleged that each "owns residential properties in New Haven, Connecticut," and derives the "majority of its income from renting the . . . properties to tenants." *Id.* ¶¶ 10-12. The business activities of Edgewood Elm Housing and Yeididei are not specifically alleged. The Complaint refers at paragraph 53 to "approximately forty-eight properties owned by Defendants." Paragraph 55(a), in describing Edgewood Village, refers to "the twenty-three Properties that it owns." Paragraph 55(b), in describing F.O.H., refers to "the seventeen Properties that it owns." This would seem to leave eight residential properties owned by Edgewood Corners.

The Complaint alleges in substance that Edgewood Corners, Edgewood Village and F.O.H. ("the Upstream Entities") transferred the bulk of the net rent monies for the residential properties they owned to YH and Edgewood Elm ("the Downstream Entities"), who held the funds and then

3

distributed them to the Yeshiva, Daniel Greer, and his wife, Sarah Greer. *Id.* ¶¶ 54, 57. The purpose of these arrangements, as alleged in paragraph 68, was to hold, shield and distribute assets of the Yeshiva, Daniel Greer and Sarah Greer, without exposing those funds to "the collection activities of creditors, including Plaintiff." *Id.* ¶ 68.

Plaintiff Mirlis's Complaint against the five corporate Defendants asserts two Claims for Relief.

The First Claim for Relief is captioned "Piercing the Corporate Veil  – Identity Theory." Plaintiff's theory is that Daniel Greer "completely dominated and controlled Defendants," which "together with D. Greer and the Yeshiva operated as a single enterprise," referred to collectively as "the Enterprise." Doc. 1, ¶ 2. The First Claim asserts that "there was such a unity of interest and ownership among the Yeshiva and Defendants that their independence had in effect ceased or had never begun," *id.* ¶ 70; "Defendants were operated under the complete control of D. Greer to shield the Yeshiva and D. Greer from their creditors," *id.* ¶ 72; "[p]iercing the corporate veil of Defendants to hold them liable for the Judgment will not cause harm to innocent third parties, and therefore is fair and equitable," *id.* ¶ 74; and the Court "should pierce the veil of the Enterprise and hold each of the Defendants liable for the Judgment" in the Underlying Action, *id.* ¶ 75.

The Second Claim for Relief is captioned "Reverse-Piercing the Corporate Veil – Instrumentality Theory." Plaintiff asserts that Daniel Greer "exercised complete domination over the finances, policies and business practices of Defendants so that Defendants had no separate mind, will, or existence of their own," *id.* ¶ 77; Daniel Greer used Defendants' property to perpetrate abuse of the Plaintiff and shield the property from Plaintiff's judgment, *id.* ¶ 78; "[r]everse-piercing the corporate veil of Defendants to hold them liable for the Judgment will not cause harm to innocent

4

third parties, and therefore is fair and equitable," *id*. ¶ 81; and the Court "should reverse-pierce the veil of the Enterprise and hold each of the Defendants liable for the Judgment," *id*. ¶ 82.

The Wherefore clause with which the Complaint concludes expresses this reverse piercing somewhat differently. Plaintiff there prays at subparagraph (b) for the entry of an order "reverse-piercing the veil *as to D. Greer*" and holding the Defendants liable for the Judgment. *Id.* at 17 (emphasis added).

Defendants move to dismiss this Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

III

The standards of review on a motion by a defendant to dismiss a complaint under Rule 12(b)(6) are well established.

The analysis begins with Rule 8(a)(2), which requires that a pleading seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) provides for dismissal of the complaint if that pleading fails "to state a claim upon which relief can be granted." In order to survive such a motion, the complaint must comply with the standard set forth in the United States Supreme Court's seminal holding in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under *Iqbal*, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)).[1] "A claim has facial plausibility when the plaintiff

---

[1] The Second Circuit has consistently adhered to the United States Supreme Court's plausibility standard set forth in *Iqbal*. *See, e.g.*, *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020)*, Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019); *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019); *Kolbasyuk v. Capital Mgmt. Servs., LP,* 918 F.3d 236, 239 (2d Cir. 2019)*.*

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

In determining whether the plaintiff has met this standard, the Court must accept the allegations in the complaint as true, draw all reasonable inferences and view all facts in the light most favorable to the non-moving party. *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279, 198 L. Ed. 2d 703 (2017). "[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). "Threadbare recitals of the elements of a cause of action,

6

supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In sum, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).[2]

In deciding a motion to dismiss under Rule 12(b)(6), "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." 952 F.3d at 75 (citing and quoting *Twombly*, 550 U.S. at 556).

IV

Plaintiff's Complaint asserts two claims against the corporate Defendants. Each claim depends upon application of the doctrine known as corporate veil piercing. The question on Defendants' motion to dismiss is whether the Complaint contains sufficient well-pleaded factual matter, accepted by the Court as true, to state claims for veil piercing that are plausible on their face.

Consideration of that question necessarily begins with a winnowing-out of the Complaint's

---

[2]  In general, in Ruling on a 12(b)(6) motion, the Court considers the pleadings and their attached exhibits. "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

contents.  The Complaint's two Claims for Relief are preceded by 50 paragraphs (¶¶ 18-68) captioned "Facts Common to All Counts" which are in reality an amalgam of commingled allegations of fact, argumentative declarations, and conclusory assertions.  I disregard everything except well-pleaded factual allegations, and from them distill the following facts, which I accept for the purposes of this motion to dismiss.

During the time and events embraced by the pleadings and proof in the Underlying Action, while Plaintiff Mirlis was a boarding student at the Yeshiva in New Haven, Plaintiff was repeatedly and continuously sexually abused by "D. Greer."  That is a reference to Daniel Greer; the Complaint also refers to non-party "S. Greer," who is David's wife, Sarah.  Daniel Greer, a rabbi, was the president, a director, and in complete control of the Yeshiva.  He was also the president, a director, and in complete control of the each of the five corporate Defendants in the case at bar.

The Yeshiva, a non-party, was and is a non-stock corporation, incorporated under the laws of Connecticut, with its principal place of business in New Haven.  Each of the five Defendants was and is a Connecticut non-stock corporation with its principal place of business in New Haven.  At the relevant times, the boards of directors of the Yeshiva and the Defendants did not have formal meetings or keep minutes.  All decisions about the management of the Yeshiva and the Defendants, including decisions to acquire or transfer property between the Yeshiva and the Defendants, were made by Daniel Greer, without holding formal board meetings or obtaining a vote from the board of directors of the Yeshiva or any of the Defendants.

Daniel Greer solely directed the transfer of assets among the Defendants, and from Defendants to himself, the Yeshiva, or his wife, Sarah Greer.  Four of the five corporate Defendants, namely, Edgewood Elm Housing, F.O.H., Inc., Edgewood Village, and Edgewood Corners, own

residential properties in New Haven and derive the majority of their income from renting the properties to tenants.  The fifth Defendant, Yedidei Hagan, does not own properties; it organizes religious services.

Specifically, Daniel Greer arranged for Defendants Edgewood Corners, Edgewood Village and F.O.H. (called "the Upstream Entities") to transfer the bulk of their net funds, after paying the expenses of their rented properties, to Defendants Yedidei Hagan and Edgewood Elm ("the Downstream Entities").  Yedidei Hagan then distributed those funds to the Yeshiva or on the Yeshiva's behalf, as directed solely by Daniel Greer.  The Yeshiva paid salaries and retirement benefits to Daniel Greer and to Sarah Greer.

The Yeshiva and the Defendants have the same accountant.  Daniel Greer manages and controls the employment of the accountant and its interaction with the Yeshiva and the Defendants.

The Yeshiva and the Defendants share offices, Post Office boxes and telephone numbers, and do not reimburse each other for the use of each other's services or property.

 The theory of Plaintiff's case is that these factual circumstances render the five corporate Defendants liable to pay the unsatisfied judgment Plaintiff obtained against Daniel Greer and the Yeshiva in the Underlying Action.  As the captions to his Complaint reveal, Plaintiff is relying upon the doctrine of piercing the corporate veil.

V

Plaintiff's theory of recovery raises the threshold question whether, in this diversity case,[3]

---

[3]    The Complaint sufficiently alleges diversity jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of New Jersey; each of the five Defendants is a Connecticut corporation with its principal place of business in New Haven; the events giving rise to the Underlying Action all occurred in Connecticut; and the over-$21,000,000 judgment Plaintiff sues to recover dramatically satisfies the requisite jurisdictional amount.

piercing the corporate veil is a recognized doctrine under the governing law.

The parties agree, and their briefs assume, that this diversity action is governed by the law of Connecticut.  That is an appropriate conclusion, given the Connecticut identity of each of the corporate Defendants, and the Connecticut locus of the conduct giving rise to the Underlying Action.

This preliminary question must be answered in the affirmative.  Connecticut law recognizes piercing of the corporate veil as an available doctrine in civil litigation.  The governing principles are stated by the Connecticut Supreme Court in *McKay v. Longman*, 332 Conn. 394 (2019):

> [T]he concept of piercing the corporate veil is equitable in nature, and no hard and fast rule exists to determine the conditions under which the entity may be disregarded as they vary according to the circumstances of each case. . . . Consequently, this court has not applied traditional veil piercing lightly but, rather, has pierced the veil only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediate to perpetuate fraud or promote injustice.

332 Conn. at 433 (citations, internal quotation marks, and ellipses omitted).  The equitable nature of corporate veil piercing has generated a considerable body of Connecticut trial court decisions, where chancellors in equity decide the question: to pierce or not to pierce.

In *Longman,* the Connecticut Supreme Court said that "Connecticut first recognized traditional veil piercing claims, by which a court may disregard a corporate fiction to hold individual stockholders liable, in *Zaist v. Olson*, 154 Conn. 563, 227 A.2d 552 (1967)." 332 Conn. at 433. The *Longman* Court's characterization of *Zaist* as a case of first impression is puzzling, since the *Zaist* opinion cites a number of *earlier* Connecticut cases as authority for the proposition that when "the corporation is so manipulated by an individual or another corporate entity as to become a mere puppet or tool for the manipulator, justice may require the courts to disregard the corporate fiction

and impose liability on the real actor."  154 Conn. 574-75 (citing cases, including *Starr Burying Ground Ass'n v. North Lane Cemetery Ass'n.*, 77 Conn. 83, 92, which the Connecticut Supreme Court decided in 1904).  In any event, what *Longman* refers to as "traditional veil piercing," which holds an individual liable for a corporation's debt, has been recognized and implemented by Connecticut courts for decades.

The case at bar does not involve *traditional* veil piercing.  Plaintiff does not seek to hold an individual liable for a corporate debt.  Rather, Plaintiff seeks to hold the Defendant corporations liable for the judgment against Daniel Greer, an individual.  This is an exercise in *reverse* veil shifting, which the Supreme Court defined in *Longman*, 332 Conn. at 429: "The principle known as reverse veil piercing is an equitable remedy by which a court imposes liability on a corporation for the acts of a corporate insider."  The *Longman* opinion adds: "Courts have generally recognized two forms of reverse veil piercing: insider and outsider," and goes on to say:

> Outsider reverse veil piercing, otherwise known as "third-party reverse piercing" and the type of reverse piercing at issue in the present case, extends the traditional veil piercing doctrine to permit a third-party creditor to pierce the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets.

332 Conn. at 429-30 (citation, internal quotation marks, and brackets omitted).  That quoted paragraph in *Longman* describes the case at bar, in which "the third-party creditor" is Plaintiff Mirlis, the "individual shareholder" debtor is Daniel Greer, and the corporations whose assets Plaintiff pursues are the Defendants.

*Longman* is in reality a Connecticut Supreme Court case of first impression because the Court squarely addressed the issue of "whether this court recognizes the doctrine of reverse piercing of the  corporate veil, and, if so, whether the trial court properly applied the doctrine under the facts

11

of the present case." *Id.* at 429.  The *Longman* Court explained that it had approached the issue once

before but left it open:

> This court has addressed reverse veil piercing only once, in *Commissioner of Environmental Protection v. State Five Industrial Park, Inc.,* 304 Conn. 128, 37 A.3d 724 (2012) (*State Five*).  Although this court determined that the facts of that case did not warrant reverse veil piercing, and, therefore, did not reach the issue, it observed that reverse veil  piercing depends on the facts of the case and recognized equitable concerns regarding adoption of the doctrine but declined to foreclose its adoption in the future when presented with the "appropriate case."   The appropriate case, this court explained, would be one in which the doctrine could be recognized under circumstances in which "it achieves its equitable purpose without harming third parties."

*Id.* at 434-35 (citing and quoting *State Five*).

In *Longman,* the Connecticut Supreme Court found itself presented with "the appropriate

case."  During the course of its lengthy analysis of the case's circumstances, the Court said: "We

conclude that Connecticut recognizes the doctrine of outsider reverse piercing of the corporate veil,"

*id.* at 432, and added: "Following our dicta in *State Five*, and on the basis of the facts in the present

case, we recognize the viability of the doctrine of reverse veil piercing," *id*. at 440.  On the merits,

the Supreme Court imposed liability on certain corporate entities by means of reverse veil piercing,

but declined to do so as to others.

It follows, therefore, that under Connecticut law, the Plaintiff in the case at bar has available

to him, in principle, the concept of reverse corporate veil piercing as a means of imposing liability

on  the  Defendant corporations  for  the  unsatisfied  judgment  in  the  Underlying  Action.[4]   The

---

[4]    In a prior Memorandum and Order [Doc. 27], I held that reverse veil piercing was cognizable under Connecticut law for the purposes of this case, although the Legislature had eliminated the doctrine in a Public Act enacted after Plaintiff's Complaint was filed.  The Act was not made retroactive, and has no effect on the case at bar, which turns upon whether Plaintiff has a

discussion *infra* considers whether, in practice, Plaintiff's Complaint alleges plausible veil piercing claims against these corporate Defendants.

VI

The state Supreme Court in *Longman,* after making the threshold decision that "Connecticut recognizes the doctrine of outsider reverse piercing of the corporate veil," then embarked upon a lengthy opinion which included a description of the elements of a viable claim for reverse corporate veil piercing.[5]   Those requisite elements furnish the governing law for Plaintiff's reverse veil piercing claims in this case.   *Longman* decided whether the plaintiff in that case proved the elements of reverse veil piercing claims at trial.   This Ruling decides whether Plaintiff in this case sufficiently alleges the elements in his Complaint.   In arriving at that decision, it is necessary to consider with care *Longman*'s delineation of the elements of a viable reverse veil piercing claim.

In defining "reverse veil piercing," the *Longman* court borrowed from previously established elements of traditional veil piercing.   *Longman* says by way of introduction: "Because reverse veil piercing constitutes an expansion of the traditional veil piercing doctrine, a brief history of traditional veil piercing provides an informative backdrop." 332 Conn. at 432-33.   *Longman* then refers to *Zaist v. Olson* as the first Connecticut case to recognize traditional veil piercing, and says: "In *Zaist*, this court held that courts may pierce the corporate veil under one of two theories: either the instrumentality rule or the identity rule."   *Id*. at 433.

---

viable claim for reverse corporate veil piercing under the Connecticut case law existing at the time Plaintiff filed his Complaint.

[5]   Justice Kahn's opinion for the Court comprises 332 Conn. at 399-461.   Chief Justice Robinson's concurring opinion comprises 332 Conn. at 461-72.   The Court's opinion describes the elements of a reverse veil piercing claim, and then considers whether the plaintiff proved those elements at trial.

The instrumentality and identity rules apply, *Zaist* held, in cases of traditional veil piercing. *Longman* points out that thereafter, when the Connecticut Supreme Court came to consider reverse veil piercing in *State Five*, 304 Conn. 128, it left open the application of that remedy in an "appropriate case," but "outlined, in dicta, three concerns that arise specifically from the application of reverse veil piercing and suggested methods of limiting application of the doctrine." *Longman*, 332 Conn. at 436 (analyzing *State Five*). The concerns expressed in *State Five* had to do with the effect of a reverse veil piercing upon "innocent" nonparties and the possible availability of adequate remedies at law: customary subjects of consideration for a chancellor in equity. *Longman*, the first Connecticut case to implement reverse veil piercing, dealt with those concerns when it said "the following is the proper test to apply when an outsider seeks to reverse pierce the corporate veil," and continued:

> We reiterate that the inquiry is a three part process. In part one, the outsider must first prove that, under the instrumentality and/or identity rules, as set forth in traditional veil piercing cases, the corporate entity has been so controlled and dominated that justice requires liability to be imposed. . . .
> . . .
> If the trial court finds that either the instrumentality or identity rule is met, then it must consider the remaining two parts of the proposed test, i.e., the *State Five* considerations. Under part two, the court must weigh the impact of such action upon innocent investors and innocent secured and unsecured creditors, and, under part three, the court must consider the availability of other remedies the creditor may pursue.

332 Conn. at 440, 442 (citations, internal quotation marks, and ellipses omitted).

Having held that the instrumentality and identity rules are alternative bases for proof satisfying *part one* of the three-part inquiry testing a reverse veil piercing claim, the Court in *Longman* then proceeded to define the elements of those rules. I will quote the *Longman* opinion

14

on those points at some length, because they control the case at bar, in which Plaintiff invokes the

identity theory (First Claim) and the instrumentality theory (Second Claim).

In *Longman* the Connecticut Supreme Court said:

> The instrumentality rule involves an examination of the defendant's relationship to the company and requires the court to determine whether there exists proof of three elements: (1) Control by the defendant, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of the plaintiff's legal rights; *and* (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

332 Conn. at 441 (citation and internal quotation marks omitted; emphases in original).  "In

assessing the first prong of the instrumentality rule," the Court continued, a number of specified

factors are considered; the Court then said:

> With regard to the second and third prongs of the instrumentality test, that is, (2) whether such control was used to commit a fraud or wrong, and (3) whether that fraud or wrong proximately caused the plaintiff's loss, this court has stated that "it is not enough simply to show that a judgment remains unsatisfied.  There must be some wrong beyond the creditor's inability to collect, which is contrary to the creditor's rights, and that wrong must have *proximately caused* the inability to collect."

*Id*. at 442 (citing and quoting *State Five*, 304 Conn. at 150) (internal quotation marks and ellipses

omitted).

*Longman* then turns to the identity rule:

> The identity rule, which this court has observed complements the instrumentality rule, has one prong, which requires the plaintiff to

15

> show that "there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, in which case an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise."

332 Conn. at 442 (citing and quoting *Zaist,* 154 Conn. at 575, 576) (some internal quotation marks and brackets removed).

It is useful to reiterate *Longman*'s holding that a plaintiff's meeting the instrumentality or identity rule does no more than satisfy the first of three parts of the test for reverse veil piercing. In either event, the trial court must then weigh the *State Five* considerations: the impact of piercing upon innocent nonparties, and the availability to the plaintiff of other remedies.

The Supreme Court's decision in *Longman* summarizes the elements and factors which comprise a viable claim for reverse corporate veil piercing under Connecticut law. To the extent, which is considerable, that the allegations of Plaintiff's Complaint simply parrot the language of *Longman*, I disregard them, on this motion to dismiss, as argumentative, conclusory, or both. The decisive question is whether the Complaint's well-pleaded factual allegations, distilled by the winnowing process in which I have engaged, state plausible claims for that equitable relief.

## VII

It is necessary at this juncture to deal with Plaintiff's contention that only the second of his two Claims for Relief is for *reverse* veil piercing. Plaintiff contends that his First Claim for relief, while demanding the remedy of veil piercing, is not *reverse* veil piercing. That argument is made in Plaintiff's Memorandum in Opposition [Doc. 22] to the motion, at 6-7:

> Defendants mischaracterize Plaintiff's claim for veil piercing under

the instrumentality claim [*sic*][6] in the First Claim for Relief as reverse veil-piercing. That claim, however, alleges traditional horizontal veil piercing in which entities are recognized to be part of the same enterprise because they are so closely intertwined as to have no separate existence.

I cannot accept that argument. It disregards the explicit holdings of the Connecticut Supreme Court in *Longman*, analyzed in Parts V and VI, *supra*. The Court was careful in *Longman* to identify explicitly the instrumentality and identity rules – *both* of them – as alternative bases for satisfying the first of three requisite prongs in the establishment of a claim for *reverse* veil piercing. The identity rule is not, as Defendants contend, invariably the product of *traditional* veil piercing. The *Longman* decision makes the definitive characteristics of *traditional* and *reverse* veil piercing clear when it quotes this passage from the Supreme Court's prior decision in *State Five*:

> In a traditional veil piercing case, a litigant requests that a court disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority stockholder. In a reverse piercing action, however, the claimant seeks to reach the assets of a corporation or some other business entity to satisfy claims or a judgment obtained against a corporate insider.

*Longman*, 332 Conn. at 443 (quoting *State Five*, 304 Conn. at 139) (citations and internal quotation marks omitted).

The case at bar is classic reverse veil piercing. In each of the two claims for relief, Plaintiff seeks to reach the assets of the corporate Defendants to satisfy his judgment against that quintessential insider, Daniel Greer. Plaintiff's characterization of his identity rule claim as "traditional" veil piercing, rather than "reverse" veil piercing, flies in the face of the Connecticut Supreme Court's holdings in *Longman* and *State Five*. I reject Plaintiff's characterization of his

---

[6] Plaintiff's First Claim invokes the identity rule, not the instrumentality rule.

17

First Claim for relief.  Plaintiff's two claims are both for reverse corporate veil piercing.  They will be  evaluated as such on this motion to dismiss.

VIII

This Court must now decide whether reverse veil piercing, as defined by the Connecticut Supreme Court in the cited cases, is applicable to the well-pleaded facts in Plaintiff Mirlis's Complaint against these corporate Defendants.  For this federal trial court, tasked with that exercise, the Connecticut Supreme Court's decision in *Longman* is a fertile source of guidance.

The state court trial judge in *Longman* was asked by the plaintiff, Robert McKay, to apply reverse veil piercing to a number of corporate or other entities involved in one or another of separate real estate transactions engineered by the defendant, Stuart Longman.  McKay had sued Longman, his former business partner, in a New York court for fraud, and in July 1996 obtained a $3,964,046.86 judgment against Longman, which  Longman did not pay.  McKay, seeking to enforce that judgment against Longman's assets, attempted to attach "two Connecticut properties: real property located in Ridgefield, which was the location of Longman's family residence (Ridgefield Property), and real property located in Greenwich (Greenwich Property)."  332 Conn. at 400.

Between 2007 and 2010, with McKay's judgment against Longman still unsatisfied, Longman and corporations or entities he controlled entered into a series of land and title transfers involving the Ridgefield and Greenwich properties.   In 2010 McKay filed a complaint in a Connecticut state court against Longman "and twenty entities affiliated with him."  *Id.* at 401. McKay alleged, *inter alia*, that "the corporate defendants constituted alter egos of Longman and requested that the trial court apply reverse veil piercing to the corporate defendants to the extent necessary to satisfy the New York judgment."  *Id.* at 402 (internal quotation marks and brackets

18

omitted).[7]  The challenged land transfers in question were Longman's "November, 2007 transfer of the Ridgefield Property to Sapphire and his February, 2010 transfer of the Greenwich Property to Lurie." *Id*.  "Sapphire" was the defendant Sapphire Development, LLC; "Lurie" was the defendant Lurie Investments, LLC; both entities were owned and controlled by Longman.

The trial court, after a bench trial, held that four particular entities (including Sapphire and Lurie) "constitute alter egos of Longman and, as such, applied the doctrine of reverse piercing of the corporate veil to reach their assets to satisfy the plaintiff's foreign judgment." *Id.* at 405.  The trial court declined to apply reverse veil piercing to other entities, referred to as "the Solaire entities," *id*. at 459, whose participation in the land transfers in question was limited to funneling money from Longman to Lurie for purchase of the Greenwich Property, and receiving some of the proceeds when, two months later, Lurie "sold the Greenwich Property to a bona fide purchaser for $1,850,000." *Id* at 426-27.  The Supreme Court, affirming the trial court's refusal to apply reverse veil piercing to these particular entities, said of them: "Unlike the former four entities, to which the trial court applied reverse veil piercing, Solaire Development, Solaire Management, and Solaire Funding were commercial businesses that provided services on an ongoing basis," *id.* at 448,  and continued:

> [T]he trial court declined to reverse pierce the Solaire entities  – although it noted that "[t]he plaintiff . . . marshaled the evidence in favor of their treatment as additional sham entities". . .  – as it determined that reverse piercing of those entities would have harmed "innocent and unrelated parties," because those entities were "actually engaged in ongoing business activities . . . [regarding] solar power installations."

---

[7]  McKay's complaint also included claims for fraudulent transfers of the Ridgefield and Greenwich properties, and requests for the imposition of constructive trusts upon the Ridgefield Property and the proceeds from the sale of the Greenwich Property.  The trial court gave judgments on those claims and the Connecticut Supreme Court affirmed them, but they play no part in the case's application of the reverse veil piercing doctrine, and I say no more about them.

. . .

> The principal reason that the trial court refused to reverse the Solaire entities is that granting such relief would affect nonculpable investors, such as Cityscape Capital and Bank of America,[8] which would be prejudiced by allowing the plaintiff "'to attach assets in which they have an interest.'" *State Five, supra*, 304 Conn. at 141 . . . . The trial court did note that "the Solaire entities present the most difficult situation," as "[t]he plaintiff . . . marshaled the evidence in favor of their treatment as additional sham entities." That court also noted, however, that it "heard testimony . . . that [those entities] are engaged in a legitimate business . . . and [t]he concern about impact on innocent parties and the collateral damage to an ongoing business, militate[s] against applying the doctrine to [them]." We conclude that the trial court did not clearly err, as we observe that, although the record revealed that the Solaire entities received transfers from Lurie containing proceeds of the sale of the Greenwich Property, applying reverse piercing to these entities would implicate the concerns raised in *State Five*.

332 Conn. 458, 460. As previously noted, the *State Five* concerns are the impact of reverse veil piercing on innocent nonparties, and the availability of other remedies the plaintiff may pursue.

As for the other defendant entities and the transactions involving the Ridgefield Property, the Supreme Court in *Longman* had no hesitation affirming the trial court's application of the reverse veil piercing doctrine. The Court stated concisely: "Our review of the trial court decision reveals that the court made all the requisite findings to establish instrumentality, fraud, and proximate cause." *Id.* at 451. "The trial court found that 'the element of domination and control' was present," *id*. at 450, and, "regarding whether Longman used his control and dominance to perpetrate a fraud or wrong, the trial court found that the evidence revealed that Longman fraudulently transferred the Ridgefield Property and the Greenwich Property to Sapphire and Lurie, respectively, 'for purposes of avoiding creditors.' . . . With respect to whether the wrong perpetrated proximately caused the

---

[8] As the result of earlier unrelated transactions, Cityscape Capital and Bank of America had acquired interests in the Solaire entities.

plaintiff's loss, the trial court found that these transfers rendered the plaintiff unable to attach Longman's assets," *id*. at 451.  The Supreme Court affirmed all these trial court findings and conclusions.

Thus the plaintiff in *Longman* had established the first of the three prongs of a viable reverse veil piercing claim, based on the instrumentality rule.  Two prongs remained for decision, which the Supreme Court felt it necessary to deal with.  The Court said: "After applying the instrumentality rule, the trial court considered whether innocent equity holders or creditors would be prejudiced by the piercing and whether adequate remedies at law were available to the plaintiff."  *Id.* at 452.  The trial court answered both questions in the negative, and consequently applied reverse veil piercing with respect to these defendants and these transactions.  The Supreme Court affirmed.

In *Longman,* the Connecticut Supreme Court decided the applicability of reverse veil piercing to facts revealed by a full evidentiary record produced by a plenary bench trial.  In the case at bar, this Court must consider the applicability of reverse veil piercing in the context of a defense motion to dismiss the plaintiff's complaint.  The question is not whether trial evidence proved that reverse veil piercing was properly applied.  Rather, the question is whether the complaint's well-pleaded facts state a plausible claim that reverse veil piercing should be applied, as that doctrine is defined by the Connecticut cases.

## IX

What this case comes down to is that Plaintiff Mirlis seeks to subject the five corporate Defendants to reverse veil piercing which, if granted, would render the Defendants' assets available to pay Mirlis's Underlying Action judgment against Daniel Greer and the Yeshiva.

Plaintiff pleads two theories in support of that effort: the identity rule and the instrumentality

rule.  These are alternative bases for reverse veil piercing.  To obtain that remedy, Plaintiff must pass the first doctrinal test by establishing its requisite elements: identity or instrumentality, fraud, and proximate cause.  If Plaintiff makes those showings, he satisfies the first test or prong, and must then satisfy the Court that he passes the second and third tests: by showing that reverse veil piercing is not precluded by prejudice to innocent third parties, or by alternative remedies available to Plaintiff.

Defendants' motion to dismiss turns on whether Plaintiff's Complaint alleges facts sufficient to state claims plausible on their face that he will succeed on these several issues.

The Complaint's factual allegations I am bound to accept are summarized in Part IV.  They state plausible claims of identity and/or instrumentality, plus fraud and proximate cause  –  the elements of the first of three parts of a viable claim for reverse veil piercing.

Those facts, which I accept, demonstrate a group of five Defendant corporations dominated by Daniel Greer, the president and a director of each of them.  Greer was in complete control of the corporations, whose boards of directors conducted no formal meetings, took no votes, kept no minutes, and allowed all decisions about the acquisition or transfer of property and assets between the corporations, the Yeshiva, and the Greers personally (D. Greer and S. Greer) to be made by Daniel Greer.  The Yeshiva and the corporate Defendants have the same offices, Post Office boxes and telephone numbers, and do not charge each other for the use of each other's services or property. These facts state a plausible claim that Daniel Greer dominated and controlled the Defendant corporations.

The pleaded facts also state a plausible claim that Daniel Greer used his dominance and control of the five Defendants to perpetrate fraud or a wrong which proximately caused injury to Plaintiff.  According to those facts, Greer manipulated the corporate Defendants in such a manner

that the residential property rent monies collected by the Upstream Entities were funneled to the Downstream Entities, and thereafter distributed to Daniel Greer and the Yeshiva (defendants in the Underlying Action), as well as to Daniel's wife, Sarah Greer.  The effect of these arrangements was to assure Daniel Greer and the Yeshiva income streams, while leaving them without assets to pay creditors, including the judgment Plaintiff obtained against them.  It is plausible to think that Daniel Greer employed these corporate maneuvers for the purpose of avoiding payments to his creditors.  These facts state a plausible claim for reverse corporation veil piercing, under both the identity and instrumentality tests articulated by the Connecticut cases.

Defendants stress in their briefs that there is no allegation Greer transferred personal assets to the corporations: consequently there can be no veil piercing claim, Defendants insist, because "the money flows in the opposite (and wrong) direction."  Doc. 18-1 (Defendants' "Memorandum of Law"), at 4.  That argument fails to persuade because it limits corporate veil piercing to the functional and legal equivalent of fraudulent conveyances.  The Connecticut Supreme Court's definition of veil piercing paints with a broader brush.

As for the second and third parts of the test for the reverse veil piercing doctrine, referred to as "the *State Five* concerns," no question is presented by the third part, which requires me to consider the availability of other remedies Plaintiff Mirlis might pursue to enforce his multi-million dollar judgment against Daniel Greer and the Yeshiva.  Plaintiff has no discernible source of assets from which to collect that judgment other than the assets of the Defendant corporations (which Plaintiff seeks to reach by reverse veil piercing).  No additional source by which Greer could pay the judgment against him is suggested by the record.  Greer himself is currently incarcerated by Connecticut following his criminal conviction for abusing Plaintiff.  The Yeshiva appears to be still

in operation, but its economic situation is surely inadequate to pay the judgment. The availability to Plaintiff of remedies other than reverse veil piercing does not exist in this case.

The closer question has to do with the consideration I must give, as a chancellor in equity, to the impact upon nonparties of an order piercing the veils of the five corporate Defendants and holding them liable to pay the judgment in the Underlying Action. The Connecticut cases hold that such an impact can, in certain circumstances, preclude veil piercing.

The cases discussing this issue typically refer to "innocent" stockholders of a corporation whose shield a plaintiff seeks to pierce in pursuit of the corporation's assets – *innocent* because the stockholders, in this perception, did not participate in the wrongdoing causing plaintiff's injury. That concept is not present in the case at bar because the five Defendants were all Connecticut non-stock corporations; there are no stockholders.

Defendants' Memorandum in support of their motion invites the Court's concern about "the fact that each of the Defendants is a Connecticut non-stock corporation established many years ago for the charitable purpose of providing affordable housing and improving the Edgewood Park neighborhood of New Haven." Doc. 18-1, at 4-5. Defendants criticize Plaintiff for making "almost no mention of the Defendants' donors and beneficiaries who would be substantially harmed by a decision to pierce their corporate veils." *Id*. at 5.[9] Defendants say accusingly:

> Plaintiff asks the Court to force the liquidation of dozens of properties in New Haven that are currently dedicated to providing affordable housing for the community. This would be a disastrous result not only for the New Haven community, but for all nonprofit corporations in Connecticut who could no longer assure donors and volunteers that their contributions will serve their intended purposes.

---

[9] The construction of the Defendant corporations' sentence is awkward. It is their veils Plaintiff seeks to pierce, not those of the unnamed "donors and beneficiaries."

24

*Id.*

This *in terrorem* prediction of the consequences of veil piercing in this case can play no part in deciding Defendants' motion to dismiss the Complaint under Rule 12(b)(6).  In that context, I may consider only the factual allegations in the complaint and such additional evidentiary material as the complaint may incorporate by reference.  There is nothing in the record before me on this motion that I can presently consider about the establishment of the Defendants for the charitable purpose of providing affordable housing, how long they have been engaged in that worthy endeavor, and who their donors and volunteers may have been.

However, one may fairly equate the "beneficiaries" of Defendants' activities, in Defendants' parlance, with the present tenants of the residential properties certain Defendants own.  The Complaint identifies three of the five corporate Defendants as owning approximately 48 residential properties in the Edgewood Park area, and describes those corporations' receipt of funds derived from renting those properties – these are the assets Plaintiff seeks to reach in this action.  The Complaint thus alleges the existence of a substantial number of nonparty residential tenants who are "innocent" in the sense that they have nothing to do with Daniel Greer's abuse of the Plaintiff.

The cited Connecticut cases mandate my consideration of the effect of a reverse veil piercing upon those tenants.  In order to begin an exploration of that issue, I put a question to counsel for Plaintiff during oral argument.   This exchange took place:

> THE COURT: Suppose you win on this litigation and you wind up with a judgment of $21 million against these corporate defendants jointly and separately.  Now you've got to enforce that judgment. How do you do that?  What do you anticipate or contemplate to be the next step?  You've got your new $21 million judgment against these corporate defendants.  What happens next?

25

MR. CESARONI [counsel for Plaintiff]: Well, I – the way we would have to proceed is to – assuming that there's no voluntary settlement of any type of judgment, which I think – which I can see no evidence of so far, I think we have – the main assets that they appear to have are the 40 or so properties that are owned by defendants. You know, I don't know. I've heard a lot of things being said about their charitable purpose or being low cost. I don't know that. I have no idea what they're rented for, to whom they're rented. I don't have any reason to believe that the defendants of Mr. – if Mr. Mirlis took them by foreclosure, that he wouldn't be a better landlord. There's no way of knowing that.

But the short answer is we would probably proceed to foreclosure on the properties, including all the rental properties, and seek to garnish amounts from bank accounts. You know, we would have to do discovery into where they had transferred funds, if there were fraudulent transfers. I think there would be a multitude of different options based on the particular situation.

Doc. 37 (Hearing Transcript), at 46-47.

Counsel's sensible and pragmatic response to the Court's question reveals that if Plaintiff succeeds on his present action in piercing the corporate Defendants' veils, and thereby renders Defendants liable to pay the Underlying Action judgment, it is possible, even likely, that a time will come when Plaintiff Mirlis forecloses upon and takes title to the Edgewood Park properties where tenants currently reside under leases with one or another of the Defendants. One cannot predict *now* whether, should that eventuality come to pass, a tenant would regard it *then* as favorable, distressing, or neutral. That would depend, presumably, on whether the tenant's lease is extended, terminated or altered: another example of the manner in which lives are altered by the operation of forces beyond an individual's control.

The question thus presented is whether the potential situation in which Defendants' tenants could find themselves is so difficult or extreme that it deprives Plaintiff of the equitable remedy of

reverse veil piercing, for which he has asserted a plausible claim. That question is for my determination, sitting as a chancellor in equity. I am unable to conclude that the justice of the cause (equity's objective) requires Plaintiff, on account of the situation of Defendants' tenants, to forego a reverse veil piercing claim that constitutes Plaintiff's only apparent means of enforcing his just judgment against Daniel Greer for childhood sexual abuse.

X

Pretrial discovery may lead to further evidence which would allow motions under Rule 56 for summary judgment. On this motion by Defendants to dismiss Plaintiff's Complaint against them, the Court concludes, for the foregoing reasons, that the motion fails.

Accordingly, the Court makes this Order:

1. Defendants' Motion [Doc. 18] to dismiss Plaintiff's Complaint is DENIED.

2. Counsel for the parties must confer and submit a revised proposed Scheduling Order for the future governance of the case. That proposed Order must be submitted not later than August 21, 2020.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         July 30, 2020


/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge

27